IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:06-CV-160-D

| | | |
|---|---|---|
| FARRAR & FARRAR DAIRY, INC. and FARRAR & FARRAR FARMS, a North Carolina general partnership, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | **ORDER** |
| MILLER-ST. NAZIANZ, INC., | ) ) ) | |
| Defendant. | ) | |

Named plaintiffs Farrar & Farrar Dairy, Inc. and Farrar & Farrar Farms ("named plaintiffs") moved for class certification pursuant to Federal Rule of Civil Procedure 23. Defendant Miller-St. Nazianz, Inc. ("Miller" or "defendant") responded in opposition, and named plaintiffs replied. For the reasons discussed below, named plaintiffs' motion for class certification is denied.

I.

The named plaintiffs in this action are Farrar & Farrar Dairy, Inc., a North Carolina corporation, and Farrar & Farrar Farms, a North Carolina general partnership. Second Am. Class Action Compl. ¶¶ 7–8 [hereinafter "SACA Compl."]. Named plaintiffs operated a dairy farm during the time period relevant to this action. Id. ¶ 9. Defendant is a Wisconsin corporation that deals in farm equipment. Id. ¶ 10; Aff. of Michael Malesevich ¶ 2 [D.E. 127-4]. By approximately November 30, 2004, defendant had purchased certain assets of a company called Ag-Bag International, Inc. ("Ag-Bag"), which sold agricultural silage bags under the name "Ag-Bag." Malesevich Aff. ¶¶ 4–6; SACA Compl. ¶ 21.

Silage is green forage or fodder that has been chopped and compacted into an anaerobic container such as a bunker or fixed silo. SACA Compl. ¶ 12. Silage undergoes an acid fermentation process inside of the anaerobic container that prevents it from spoiling. Id. This process is called "ensilage." Id. ¶ 13. "Silage bags" are a common type of anaerobic container used in the ensilage process. See id. ¶¶ 12, 14. Silage bags were developed as an alternative to storing silage in bunkers or fixed silos. Aff. of Stashia Sutton ¶ 3 [D.E. 127-7].

Silage bags are extremely sensitive. "Anything that weakens the plastic can cause the bag to split all the way down from one [end] to the other." Def.'s Mem. in Opp'n to Pl.'s Mot. for Class Certification 11 [hereinafter "Def.'s Mem."] [D.E. 126]. Silage bags fail for numerous reasons, including:

- Overfilling the bag (see Dep. of Steven Pesik 193:11–14, Dec. 6, 2006 [D.E. 127-8]);
- Weather, such as hail (see id. at 193:14–15);
- Punctures from animals, such as rodents or raccoons (see id. at 193:15);
- Mechanical problems with the machine that stuffs the silage bag (see Aff. of Karen Tidwall, Ex. 16 at 5 [D.E. 127-17]);
- Bad bag handling practices (id.);
- Silage that is too wet (Dep. of Arthur Schuette 128:22–129:2, Apr. 26, 2007 [D.E. 127-6]);
- Silage that is too dry (id. at 132:4–16);
- Silage composed of crops that tend to expand inside the silage bag (id. at 129:9–13);
- Storing the silage bag on a slope (Expert Report of Dr. Keith Bolsen 8 [D.E. 127-18]);
- Storing the silage bag on an improperly-drained surface (see id.);
- Storing the silage bag on a surface that is not solid (see id.).

Although defendant's main goal in purchasing Ag-Bag was to acquire its farm equipment business, defendant decided to continue distributing silage bags under the "Ag-Bag" name. See Malesevich Aff. ¶ 6. When defendant purchased most of Ag-Bag's assets, Ag-Bag had a supply agreement with a company called Up North Plastics, Inc. ("Up North"). SACA Compl. ¶ 21;

2

Malesevich Aff. ¶ 6. Up North manufactured the plastic that Ag-Bag used for its silage bags. SACA Compl. ¶¶ 21–22; see Malesevich Aff. ¶ 6. Defendant did not assume Ag-Bag's supply agreement with Up North when it purchased Ag-Bag's assets, and defendant therefore began looking for another plastic supplier to manufacture the material for the silage bags. SACA Compl. ¶ 23; Malesevich Aff. ¶¶ 6–7. Defendant eventually began a business relationship with a Belgian company called Hyplast NV ("Hyplast"), which it engaged to manufacture plastic for the silage bags. See Malesevich Aff. ¶¶ 7, 9, 14, 17.

Defendant did not receive a formula for the plastic that Ag-Bag used in making its silage bags when defendant purchased Ag-Bag. Id. ¶ 16. Instead, defendant gave Hyplast an Ag-Bag silage bag that Up North had manufactured, and Hyplast reverse-engineered a formula. Id. ¶¶ 15–16. According to named plaintiffs, Hyplast's reverse-engineered plastic formula did not properly address many of the necessary qualities that a plastic formula for silage bags requires. See SACA Compl. ¶ 24.[1] However, according to named plaintiffs, defendant used the Hyplast-formulated plastic to put Ag-Bags to market, even though defendant knew that the Hyplast-formulated plastic was insufficient. See id. ¶ 25.

Beginning in or about April 2005, named plaintiffs purchased Ag-Bag silage bags from defendant's authorized dealers. SACA Compl. ¶ 27. According to named plaintiffs, these silage bags were defective, and failed even though they were used properly. See id. ¶ 30. Named plaintiffs allege that they suffered various damages from these failures, including the costs of re-bagging the

---

[1] Defendant and Hyplast had their own legal disagreement, which settled in late December 2005. See Malesevich Aff. ¶ 21. Subsequently, named plaintiffs sued Hyplast in this case as well. See First Am. Class Action Compl. [D.E. 28]. Defendant also attempted to bring a cross-claim against Hyplast, but the court determined that it lacked personal jurisdiction over Hyplast [D.E. 103].

3

Case 5:06-cv-00160-D   Document 136   Filed 08/25/08   Page 3 of 18

silage that did not spoil, disposing of the silage that did spoil, acquiring new silage bags and silage storage techniques, acquiring new silage to feed the livestock, decreased farm profitability, decreased dairy production, and other costs. Id. ¶ 31.

Named plaintiffs bring claims for negligence (id. ¶¶ 47–53); breach of express warranty (id. ¶¶ 54–61); breach of implied warranty of merchantability (id. ¶¶ 62–66); unfair trade practices in violation of Wisconsin law (id. ¶¶ 67–70); and restitution/disgorgement of unjust enrichment (id. ¶¶ 71–73). Named plaintiffs seek to represent a class consisting of all persons (both natural and corporate) who purchased "Ag-Bag" brand silage storage bags that were manufactured between November 30, 2004 and January 1, 2006. See id. ¶ 40.

II.

Federal Rule of Civil Procedure 23(a) provides that a plaintiff may bring a class action as a representative party if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These basic prerequisites are commonly referred to as numerosity, commonality, typicality, and adequacy, respectively. To bring a class action, the proposed class representative must not only satisfy these requirements, but also one of the requirements from Federal Rule of Civil Procedure 23(b). See Fed. R. Civ. P. 23(b).

Named plaintiffs here seek to bring a class action under Rule 23(b)(3). See SACA Compl. ¶ 41. Rule 23(b)(3) provides that a class action is appropriate where

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class

4

action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
   (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
   (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
   (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
   (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). This four-factor list is nonexclusive. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615 (1997).

Rule 23(b)(3) contains two independent prongs (predominance and superiority, respectively), both of which must be satisfied before a class action can proceed under that Rule. See, e.g., Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 424 (4th Cir. 2003) ("Rule 23(b)(3) class actions must meet predominance and superiority requirements not imposed on other kinds of class actions."). Rule 23(b)(3) suits "involve situations where [class action] treatment is not as clearly called for." Id. (quotation omitted). Rule 23(b)(3) class actions have therefore been called the "most adventuresome" type of class action. See Amchem, 521 U.S. at 614. The party seeking class certification bears the burden of proof on the predominance and superiority requirements. See, e.g., Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 321–22 (4th Cir. 2006); Gregory v. Finova Capital Corp., 442 F.3d 188, 190 (4th Cir. 2006).

In determining whether to certify a class action, a court should interpret Rule 23 in such a manner as to promote justice and judicial efficiency. See, e.g., Gunnells, 348 F.3d at 424. Although mass tort litigation is not improper under Rule 23(b)(3), a court must ensure that class certification in a mass tort case really does foster those goals. See id. A district court must therefore take a "close look," see Amchem, 521 U.S. at 615 (quotation omitted), and engage in "rigorous analysis." See Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 161 (1982); Thorn, 445 F.3d at 318. District

courts have broad discretion in deciding whether to certify a class. Thorn, 445 F.3d at 317; Gunnells, 348 F.3d at 424.

The court has carefully considered the requirements of Rule 23 and the record in this case. For the reasons discussed below, even if the court assumes (without deciding) that named plaintiffs can meet the requirements of Rule 23(a),[2] they have failed to meet the requirements of Rule 23(b). See Thorn, 445 F.3d at 319 ("Because we base our decision on the district court's alternative holding[] that certification was improper under Rule[] 23(b)(3) . . . , we assume, without deciding, that Appellants satisfied Rule 23(a) . . . ."); cf. Deiter v. Microsoft Corp., 436 F.3d 461, 468 (4th Cir. 2006) ("Because we affirm the district court's reliance on Rule 23(a)(3) to deny [class certification], we do not reach the additional reason given by the district court based on Rule 23(b)(3) . . . ."). Thus, named plaintiffs' motion for class certification is denied.

### A.

Named plaintiffs seek to represent a class consisting of:

> All persons—including individuals and corporations—in California, Indiana, Iowa, Kentucky, Maryland, Michigan, Minnesota, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Vermont, Virginia, West Virginia and Wisconsin who purchased from Miller or an authorized Miller dealer Ag-Bag® silage storage bags—manufactured between November 30, 2004 and January 1, 2006—for personal or commercial use and suffered some form of damage caused by the defect.

Pls.' Mot. for Class Certification 1 [D.E. 116]; see also SACA Compl. ¶ 40 (describing proposed class as "[e]very person, including individuals and corporations, in the United States of America who has purchased silage storage bags manufactured from November 30, 2004 through January 1, 2006 and sold under the brand name 'Ag-Bag®' that were designed, manufactured, advertised, marketed,

---

[2] Defendant vigorously contends that named plaintiffs cannot meet the requirements of Rule 23(a). See Def.'s Mem. 16–23.

6

warranted, distributed, and/or sold by Miller or an authorized Miller dealer"). The court will refer to this proposed class as the "global class."

Like any proposed class under Rule 23(b)(3), named plaintiffs bear the burden of showing that the global class meets the predominance requirement. See, e.g., Fed. R. Civ. P. 23(b)(3); Thorn, 445 F.3d at 321–22. The predominance inquiry cannot be reduced to any mechanical test or set of guidelines. See, e.g., 2 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 4:25, at 171–73 (4th ed. 2002). At bottom, it tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation," Amchem, 521 U.S. at 623, and whether certification would increase judicial economy. See id. at 615. To determine predominance, a court should take the entire case into account, including the claims, defenses, facts, underlying substantive law, and even compulsory counterclaims and any permissive counterclaims already brought. See, e.g., Klay v. Humana, Inc., 382 F.3d 1241, 1254 & n.7 (11th Cir. 2004). The court should look to see whether common issues would be the "central" or "overriding" issues in the case. See, e.g., Conte & Newberg, supra, § 4:25, at 173. In making this determination, Rule 23(b)(3) lists four non-exclusive factors that the court should consider. See Fed. R. Civ. P. 23(b)(3); Amchem, 521 U.S. at 615.

1.

As the second amended complaint indicates, each of named plaintiffs' causes of action—negligence (see SACA Compl. ¶ 53), breach of express warranty (see id. ¶ 61), breach of implied warranty of merchantability (see id. ¶ 66), Wisconsin unfair trade practice (see id. ¶ 70), and equitable claims (see id. ¶ 73)—requires named plaintiffs to show causation. Further, as mentioned, silage bags are extremely sensitive, and numerous things can cause silage bags to fail, including commonplace forces and events. Even assuming that named plaintiffs ultimately prove that the bags are defective, defendant will almost certainly bring at least one causation challenge (and likely many

7

causation challenges) against each global class member. It is these individual causation questions—and not the common issues—that would be the predominating issues in the case were the court to grant global class certification.

In opposition to this conclusion, named plaintiffs ask the court to cordon off these causation issues and consider only the existence of a class-wide defect, leaving the causation issues to be determined later. See Pls.' Reply Mem. in Supp. of Mot. for Class Certification 16 & n.21 [hereinafter "Pls.' Reply"] [D.E. 134]. Named plaintiffs cite several cases which they believe support their position, including Daffin v. Ford Motor Co., No. C-1-00-458, 2004 U.S. Dist. Lexis 18977 (S.D. Ohio July 15, 2004) (unpublished), aff'd, 458 F.3d 549 (6th Cir. 2006); Zeno v. Ford Motor Co., 238 F.R.D. 173 (W.D. Pa. 2006); In re Telectronics Pacing Sys., Inc., 172 F.R.D. 271 (S.D. Ohio 1997), rev'd on unrelated grounds, 221 F.3d 870 (6th Cir. 2000); and In re Copley Pharm., Inc., 158 F.R.D. 485, 492 (D. Wyo. 1994). See Pls.' Reply 16. However, these cases do not help named plaintiffs. Daffin, Zeno, and Telectronics are distinguishable, and Copley raises an unsettled issue of law discussed in Part II.C below.

In Daffin, the class plaintiff sued Ford over an allegedly defective throttle body assembly in Mercury Villager minivans. See 2004 U.S. Dist. Lexis 18977, at *2–*3. The particular symptom that the class plaintiff alleged was a sticking accelerator pedal. See id. In opposition to class certification, Ford argued that common issues did not predominate because many things besides a defect could cause the minivans' accelerator pedals to stick. Id. at *21. However, the court rejected Ford's arguments because "[t]he alleged injury . . . is not accelerator sticking but economic loss [to the minivans' value] resulting directly from the allegedly defective [throttle body]. The causation question is therefore vastly simplified . . . ." Id. at *21–*22. Here, unlike Daffin, named plaintiffs seek to recover damages for the *results* of the failure of the allegedly defective silage bags—the

8

gravamen of their complaint is not diminution in the silage bags' intrinsic value. See SACA Compl. ¶ 52, cf. Daffin, 2004 U.S. Dist. LEXIS 18977, at *5–*6 ("The 'injury' suffered by owners who have not experienced sticking must therefore be the economic injury of the diminution in value of the car caused by a defective throttle body."). Therefore, were the Daffin defendant to prove that something other than a throttle body defect caused the accelerators to stick, the class plaintiff would still be able to recover if she could have proven that the throttle bodies were defective. Thus, Daffin does not help named plaintiffs.

Zeno v. Ford Motor Company is similarly unhelpful. In Zeno, the class plaintiff sued Ford over its alleged failure to provide him and all others similarly situated with an upgraded pickup truck radiator pursuant to Ford's alleged representations to class members. See 238 F.R.D. at 174–83. Granting the class plaintiff's motion for class certification, the court noted that the primary issues in the case revolved around whether "Ford had a contractual obligation" and "whether this obligation was breached." Id. at 197. Because the contracts at issue in that case could be considered "form contracts" for the purposes of the litigation, construction of contract terms in a common manner using the same "generalized extrinsic evidence" was particularly appropriate. See id. Unlike Zeno, the causation inquiries in this case are manifold and varied, and the case does not turn on the construction of boilerplate contract language common to all putative class members.

In re Telectronics Pacing Systems is also inapposite. There, the class plaintiff sought to represent a class of individuals whose heart-regulating pacemaker devices were allegedly defective. See 172 F.R.D. at 276–78. The court rejected the defendant's argument that common issues did not predominate, noting that "[this case] appears to be the exception to the general rule that medical products liability actions require extensive proof of individualized issues." Id. at 288. Although the defendant argued that "there could be multiple reasons why the [pacemaker wires

9

malfunctioned], such as doctor error in the implantation," the court found that "[t]he factual context of this products liability action indicates that a single course of conduct—the manufacture or design of [a particular pacemaker wire]—is probably the reason for the [malfunction]." Id. at 289. In this case, unlike Telectronics, the record indicates numerous potential alternative causes, all of which are eminently plausible and not the subject of mere conjecture.[3]

"Although common questions need not be dispositive of the entire class action, their resolution should at least provide a definite signal of the beginning of the end." Mertens v. Abbott Labs., 99 F.R.D. 38, 41 (D.N.H. 1983) (citation omitted). In this case, resolution of the common questions would be the beginning of the beginning. Certification would be an exercise in futility, as the court would need to address the numerous individual causation questions one by one even if named plaintiffs are able to prove that the silage bags are defective. See, e.g., id. (denying class certification where resolution of the common questions "would do substantially nothing to advance the common cause of class members" because the multiplicity of individualized causation issues rendered the common questions "a determination in principle [that] would serve no useful purpose in resolving the individual claims"). Individual trials are the appropriate course of action for the situation this case presents. Accordingly, because named plaintiffs have not shown that common issues would predominate over the individual causation questions were the court to grant global class

---

[3] The court is not opining on the ultimate merits of defendant's causation arguments, nor is the court concluding that named plaintiffs' case would be defeated by the causation arguments. Cf. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177–78 (1974). Rather, the court is analyzing the predominance question in light of the issues that are likely to arise in this case. See, e.g., Falcon, 457 U.S. at 160 ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." (quotations omitted)); Thorn, 445 F.3d at 319.

certification, named plaintiffs' motion for global class certification is denied.[4]

2.

Individual issues also would predominate over common issues with respect to the numerous affirmative defenses that defendants intend to present against the potential class plaintiffs.[5] These affirmative defenses include, but are not limited to:

- Certain class members purchased silage bags from entities other than defendant or its authorized dealers;
- Certain class members' claims are barred by the economic loss doctrine;
- Certain class members' claims are barred by various individual contracts;
- Certain class members' claims are barred by applicable statutes of limitation;
- Certain class members' claims are barred by the state-of-the-art doctrine.

See Def.'s Answer and Affirmative Defenses to Pls.' Second Am. Class Action Compl. 12–15 [hereinafter "SACA Answer"] [D.E. 115]. Defendant argues that these too would overwhelm the common issues with respect to each class member's case. See Def.'s Mem. 39-41.

Defendant cites Gunnells, where the Fourth Circuit stated: "[R]egardless of other courts' interpretations of Rule 23, we have flatly held that when the defendants' affirmative defenses may depend on facts peculiar to each plaintiff's case, class certification is erroneous." Gunnells, 348 F.3d at 438 (quotation and alteration omitted). Named plaintiffs attempt to distinguish Gunnells by

---

[4] Alternatively, a class action is not the superior method for handling this case. The difficulties in managing a class action in which the court would need to address individual issues over and over again would far outweigh any marginal increase in judicial efficiency that might result from class certification. See Fed. R. Civ. P. 23(b)(3)(D); Thorn, 445 F.3d at 319, 327–29. Individual trials are a superior method for handling the issues in this case.

[5] Technically, only some of defendant's defenses are "affirmative" defenses. See Black's Law Dictionary 451 (8th ed. 2004) (defining "affirmative defense" as "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true," and in which the defendant bears the burden of proof). However, for the purpose of simplicity the court will follow the parties and refer to all of defendant's defenses as affirmative defenses.

arguing that here, unlike in Gunnells, they can establish liability without considering the affirmative defenses. See Pls.' Reply 17 n.22 (distinguishing Gunnells because in that case, reliance was a material element of those plaintiffs' cause of action, and reliance was undercut by those defendants' affirmative defenses). However, regardless of whether Gunnells is factually distinguishable, certification is still inappropriate. "[L]ike other considerations, affirmative defenses must be factored into the calculus of whether common issues predominate." Gunnells, 348 F.3d at 438. Here, as with the causation issues, the affirmative defenses would dominate most every class member's case. Just as with the causation questions, the court would be forced to address the individual class members' cases one at a time while defendant argued over and over again that some affirmative defense precludes recovery, even assuming that named plaintiffs were able to prove that the silage bags were defective.

In opposition to this conclusion, named plaintiffs argue that the court could simply separate the class members subject to affirmative defenses into particular subclasses, or exclude them from the certified class altogether. See Pls.' Reply 17. Unfortunately for named plaintiffs, this is no solution. Many of the class members are probably subject to more than one affirmative defense, thereby placing them in multiple subclasses. Further, the number of subclasses would rapidly proliferate. Given the variety and breadth of defendant's affirmative defenses, it is hard to see who would be left inside the original class were the court to adopt named plaintiffs' proposed solution. The number and complexity of the resulting affirmative-defense-based subclasses would defeat the entire purpose of granting class certification. See, e.g., In re Fosamax Prods. Liab. Litig., 248 F.R.D. 389, 401–03 (S.D.N.Y. 2008) (finding that individual issues associated with affirmative defenses predominated over common questions, and rejecting suggestion that these difficulties could be overcome through artful subclassing).

Accordingly, even if the court agreed with named plaintiffs that common questions would predominate over the individual causation questions, named plaintiffs' motion for global class certification would still be denied. Named plaintiffs have not shown that common questions would predominate over the individual affirmative defenses were the court to grant global class certification.[6]

B.

Named plaintiffs believe that the chief problem with their proposed global class is the variation in each state's law, and propose to solve this problem by dividing the global class into four subclasses. See Pls.' Mem. in Supp. of Mot. for Class Certification 23–28 [hereinafter "Pls.' Mem."] [D.E. 117]. Defendant disputes that this proposed subclassing solves the individual state law issues and allows common issues to predominate. See Def.'s Mem. 25–34. However, regardless of whether named plaintiffs' proposed subclassing can solve the substantial predominance problem arising from differing state laws in the sixteen states where the proposed class members reside, it cannot address the predominance problem arising from the inevitable individualized factual inquiries that would be necessary for most every class member's case. The causes of action will be overwhelmed by the same individualized issues of causation or affirmative defenses discussed above.

A subclass must independently satisfy all of the requirements of Rule 23. See, e.g., Cent. Wesleyan Coll. v. W.R. Grace & Co., 6 F.3d 177, 189 (4th Cir. 1993); In re A.H. Robbins Co., 880 F.2d 709, 728 (4th Cir. 1989), abrogated on other grounds by Amchem Prods., Inc. v. Windsor, 521

---

[6] Alternatively, a class action is not the superior method for handling this case. The difficulties in managing a class action with multiple, overlapping, affirmative-defense-based subclasses would far outweigh any marginal increase in judicial efficiency that might result from class certification. See Fed. R. Civ. P. 23(b)(3)(D). Individual trials are a superior method for handling the issues in this case.

13

U.S. 591 (1997); Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). Accordingly, named plaintiffs bear the burden of proving that each of their proposed subclasses satisfies all Rule 23 requirements, including predominance. Named plaintiffs have not met this burden.

Named plaintiffs propose four subclasses, sorted by state into groups that allegedly have common legal requirements, consisting of a "negligence" subclass (Pls.' Mem. 25–26 & Ex. 24), a "Consumer Protection Act" subclass (id. at 26–27 & Ex. 21), an "implied warranty" subclass (id. at 27 & Ex. 25), and an "express warranty" subclass (id. at 27–28 & Ex. 26). Some of these subclasses may (possibly) address some of the affirmative defenses that defendant plans to raise. Compare SACA Answer 14 ("Plaintiffs' and/or the alleged class members' claims may be barred based on a lack of privity with [defendant].") with Pls.' Mem. 27 ("Eliminated from this Subclass is any state that requires privity as a prerequisite for an implied warranty of merchantability claim."). However, other of defendant's intended affirmative defenses are not addressed by named plaintiffs' subclasses. See, e.g., SACA Answer 14 ("Plaintiffs and/or the alleged class members' claims may be barred by their failure to comply with [the silage bags'] instructions or warnings."). Further, none of named plaintiffs' proposed subclasses address the manifold causation inquiries. For the reasons discussed above, these issues would dominate most every class member's case.

Although the court may consider other potential subclasses sua sponte, see U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 407–08 (1980), it is hard to imagine how to devise any subclasses that adequately address the causation issues without eviscerating the purpose of class certification. First, the number of potential causes of bag failure are practically innumerable. The court cannot imagine all of the possible causes of silage bag failure and sort them into subclasses, particularly because these alternative causes are highly plausible and do not require fantastic

14

hypotheticals. Cf. Telectronics, 172 F.R.D. at 289. For example, something as simple as grass that is too wet or too dry can cause the silage bag to fail. See Schuette Dep. at 128:22–129:2, 132:4–16.[7]

However, even if the court could somehow sort the plausible potential alternative causes into subclasses and certify each one, that would not help resolve this case. As discussed, many (if not all) class members would fit under more than one subclass, and in any case the proliferating number of subclasses would defeat the purpose of having a class action. By the time the court adjudicated a "grass too wet" subclass, a "grass too dry" subclass, an "expanding grass" subclass, and so on *ad absurdum*, there would be little (if any) increase in judicial efficiency resulting from class certification.[8]

Accordingly, the court rejects named plaintiffs' argument that skillful subclassing can solve any predominance and superiority problems with their proposed class action. Even if named plaintiffs' proposed subclasses can avert the individual issues of state law inherent in named plaintiffs' multistate class action, neither named plaintiffs' proposed subclasses nor any conceivable set of subclasses can avoid the individual causation and affirmative defense issues that are certain to arise in this case.[9]

C.

Finally, named plaintiffs suggest that, even if the court finds that global class certification

---

[7] Again, the court is not opining on the merits of this case. Rather, the court is simply analyzing the issues in the context of this case. See Falcon, 457 U.S. at 160; Thorn, 445 F.3d at 319.

[8] Alternatively, taking this route would render the class action unmanageable, and it would therefore fail the superiority requirement. See Fed. R. Civ. P. 23(b)(3)(D).

[9] The court notes that there is academic debate as to whether a subclass may be certified without certifying an overarching global class. See generally Scott Dodson, Subclassing, 27 Cardozo L. Rev. 2351 (2006). In light of the court's conclusion, the court need not address this legal issue.

15

and subclass certification are inappropriate, the court should still certify the common issues in the case for class certification under Federal Rule of Civil Procedure 23(c)(4)(A). See, e.g., Pls.' Reply 18–20. In particular, named plaintiffs ask the court to certify the following common issues for class treatment: (1) whether the silage bags were defective; (2) whether defendant's representations and/or omissions with respect to the silage bags were unfair or deceptive; (3) whether defendant's express warranty limitations on the silage bags' warranties fail their essential purpose and/or are unconscionable; and (4) whether the silage bags were fit for their ordinary purpose. Id. at 19.

Some circuit courts have held or opined that a district court may certify individual issues for class action treatment, even if class certification itself is inappropriate. See In re Nassau County Strip Search Cases, 461 F.3d 219, 225–26 (2d Cir. 2006); Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996).[10] Other courts disagree. See, e.g., Castano v. Am. Tobacco Co., 84 F.3d 734, 745 n.21 (5th Cir. 1996). Although the Fourth Circuit appeared to address this issue in Gunnells, its analysis is unclear. Specifically, the Gunnells court appeared to hold that a district court may certify individual *causes of action*, not individual *issues*, for class treatment. See 348 F.3d at 422–30.

However, the court need not determine whether issue certification exists in the Fourth Circuit. Even assuming that it does, a district court should decline to certify issues where there are so many individual issues in the case that certifying the common issues would have a negligible effect on judicial efficiency. See In re St. Jude Med., Inc., 522 F.3d 836, 841 (8th Cir. 2008) ("Even

---

[10] See also Copley, 158 F.R.D. at 491 ("[T]he Defendant is correct in pointing out significant issues which require individual determination, but is incorrect in its assertion that there are not equally significant common issues. Because of this dichotomy, the Court must look to its authority under Rule 23(c)(4)(A) to grant class certification for particular issues, which the Court may do sua sponte.").

16

courts that have approved 'issue certification' have declined to [exercise it] where the predominance of individual issues is such that limited class certification would do little to increase the efficiency of the litigation."); McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 234 (2d Cir. 2008) ("We recognize that a court may employ Rule 23(c)(4) to certify a class as to common issues that do exist . . . . Nevertheless, in this case, given the number of questions that would remain for individual adjudication, issue certification would not reduce the range of issues in dispute and promote judicial economy." (quotation omitted)); see also McDaniel v. Qwest Commc'ns Corp., No. 05 C 1008, 2006 WL 1476110, at *53 (N.D. Ill. May 23, 2006) (unpublished) ("However wise it may be, in appropriate circumstances, to permit class counsel to separate issues from one another under Rule 23(c)(4)[], the court is not inclined to certify the issue subclasses here . . . [because] common issues do not predominate over individual ones even when subclasses are defined by the six issues identified by Plaintiffs.").

Accordingly, even if issue certification is permissible in the Fourth Circuit and even if the court were to certify these issues for class treatment, the multiplicity of individual causation and affirmative defense issues discussed above would still remain. At best, the court might possibly advance judicial efficiency by certifying these individual issues. The court concludes that such a possible, speculative increase in judicial efficiency that might be gained from certifying the common issues does not merit issue certification (if it exists), because the individual issues of causation and affirmative defenses would still predominate over the common issues even if the court were to certify the common issues. Thus, named plaintiffs' request to certify certain issues is denied.[11]

---

[11] Alternatively, a class action would not be the superior method to handle this litigation. See Amchem, 521 U.S. at 615. Individual trials are a better mechanism for handling this case in light of the multiplicity of individual issues.

III.

For the reasons discussed above, none of named plaintiffs' certification theories meet the predominance and superiority requirements of Rule 23(b)(3). Named plaintiffs' motion for class certification [D.E. 116] is DENIED.

SO ORDERED. This 25 day of August 2008.

JAMES C. DEVER III
United States District Judge