IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:06-CV-160-D

| | |
|---|---|
| FARRAR & FARRAR DAIRY, INC. and FARRAR & FARRAR FARMS, a North Carolina general partnership,<br><br>     Plaintiffs,<br>  v.<br><br>MILLER-ST. NAZIANZ, INC.,<br><br>     Defendant. | **ORDER** |

Farrar & Farrar Dairy, Inc. ("Farrar Dairy") and Farrar & Farrar Farms ("Farrar Farms") (collectively plaintiffs) sued Miller-St. Nazianz, Inc. ("Miller" or defendant) alleging that Miller sold them defective silage bags that failed despite their normal use. Plaintiffs claim negligence, breach of express warranty, breach of implied warranty of merchantability, unfair trade practices in violation of Wisc. Stat. § 100.20, and unjust enrichment. On August 20, 2010, Miller filed a motion to exclude the testimony of plaintiffs' expert at trial [D.E. 154] and a motion for summary judgment [D.E. 149]. On October 11, 2010, plaintiffs responded in opposition to the motion for summary judgment [D.E. 163]. On October 12, 2010, plaintiffs responded in opposition to the motion to exclude [D.E. 168]. On November 1, 2010, Miller replied in support of the motion for summary judgment [D.E. 171]. On November 22, 2010, plaintiffs filed a sur-reply [D.E. 175], and requested leave of court to file a third amended complaint [D.E. 176]. On December 16, 2010, Miller responded in opposition to the motion to file a third amended complaint [D.E. 178], to which the plaintiffs replied [D.E. 180]. For the reasons stated below, the court denies leave to amend the complaint, grants the motion for summary judgment, and denies the motion to exclude testimony of plaintiffs' expert at trial as moot.

I.

In its motion for leave to file a third amended complaint, plaintiffs primarily seek to replace their unfair trade practices claim in violation of Wisconsin law with an unfair trade practices claim in violation of North Carolina law. Plaintiffs argue the court must grant their motion because Federal Rule of Civil Procedure 15(a)(2)'s liberal standard requires it. Pls.' Mem. Supp. Mot. Leave Am. 2. In opposition, Miller cites Rule 15 and claims that the proposed amended complaint is untimely, offered in bad faith, futile, and prejudicial. Def.'s Mem. Opp'n Mot. Am. 3.

Provided certain time requirements are met, a party may amend a pleading once as a matter of course. Fed. R. Civ. P. 15(a)(1). Additional amendments are allowed only with the permission of the opposing party or with leave of court, and such leave should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). However, when a party files a motion to amend "after the deadlines provided by a scheduling order have passed, [Rule 16(b)'s] good cause standard must be satisfied to justify leave to amend the pleadings." Nourison Rug Corp. v. Parvizian, 535 F.3d 295, 298 (4th Cir. 2008). Here, the original scheduling order required that motions "to amend pleadings ... be made promptly after the information giving rise to the motion becomes known to the party or counsel. Any such motion filed after October 20, 2006, must meet the standards of Fed. R. Civ. P. 15 and 16." [D.E. 22] at 2. On November 30, 2006, the court extended the deadlines set forth in that order by 60 days [D.E. 53]. Therefore, any motion to amend filed after December 19, 2006, had to meet Rule 16(b)'s good cause standard.[1]

"Rule 16(b)'s good cause standard focuses on the timeliness of the amendment and the reasons for its tardy submission; the primary consideration is the diligence of the moving party."

---

[1] In fact, the court considered Rule 16 in relation to Farrar Dairy's motion for leave to file a second amended complaint. See [D.E. 112] at 7–10.

Montgomery v. Anne Arundel County, 182 F. App'x 156, 162 (4th Cir. 2006) (per curiam) (unpublished). Good cause exists when a party's reasonable diligence before the expiration of the amendment deadline would not have resulted in the discovery of the evidence supporting a proposed amendment. United States v. Godwin, 247 F.R.D. 503, 506 (E.D.N.C. 2007). The burden to demonstrate good cause is on the moving party. Id. Prejudice, futility, and bad faith are "Rule 15(a) consideration[s]," and the court should not consider them unless the movant meets its initial burden under Rule 16(b). Stonecrest Partners, LLC v. Bank of Hampton Roads, No. 7:10-CV-63-FL, 2011 WL 923950, at *4 (E.D.N.C. Mar. 14, 2011) (quoting Nourison Rug Corp., 535 F.3d at 299).

Here, plaintiffs have failed to demonstrate good cause for waiting until November 22, 2010, to seek leave to file their third amended complaint in order to add a claim under the North Carolina unfair trade practices statute. Indeed, plaintiffs fail to offer any reason for their delay, much less attempt to prove reasonable diligence. Cf. Nourison Rug Corp., 535 F.3d at 298–99; Godwin, 247 F.R.D. at 505–08. Plaintiffs filed their motion for leave to file a third amended complaint only after concluding that they lack a cause of action for unfair trade practices under Wisc. Stat. § 100.20. See Pls.' Mem. Opp'n Summ. J. 2 n.1.[2] Furthermore, plaintiffs state that the Wisconsin and the North Carolina unfair trade practices statutes "involve[] substantially similar facts and analysis." Pls.' Mem. Supp. Mot. Leave Am. 4. Thus, by definition, if plaintiffs had been reasonably diligent, they would have sought to amend their complaint to add the North Carolina claim before the expiration of the amendment deadline of December 19, 2006. The tardy discovery of a desire to pursue a claim

---

[2] For a private party to have a cause of action under Wisc. Stat. § 100.20, it must show the defendant violated an administrative order of the Wisconsin Department of Agriculture, Trade, and Consumer Protection. Gallego v. Wal-Mart Stores, Inc., 707 N.W.2d 539, 546–47 (Wis. Ct. App. 2005); Emergency One, Inc. v. Waterous Co., 23 F. Supp. 2d 959, 971–72 (E.D. Wis. 1998); Deadwyler v. Volkswagen of Am., Inc., 134 F.R.D. 128, 133–34 (W.D.N.C. 1992).

3

under North Carolina's unfair trade practices statutes falls "far short of what is required to satisfy the good cause standard." Nourison Rug Corp., 535 F.3d at 298; Godwin, 247 F.R.D. at 505–08. Therefore, plaintiffs' motion for leave to file a third amended complaint is denied.

II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Plaintiffs operated a dairy farm during the time period relevant to this action. Second Am. Compl. ¶¶ 7–9. Miller is a Wisconsin corporation that sells farm equipment and products. Id. ¶ 10; Malesevich Aff. ¶ 2. By approximately November 30, 2004, Miller had purchased certain assets of a company called Ag-Bag International, Inc. ("Ag-Bag"), which sold agricultural silage bags under the name "Ag-Bag." Malesevich Aff. ¶¶ 4–6; Second Am. Compl. ¶ 21.

Silage is green forage or fodder that has been chopped and compacted into an anaerobic

4

container such as a bunker or fixed silo. Second Am. Compl. ¶ 12. Silage undergoes an acid fermentation process inside of the anaerobic container that prevents it from spoiling. Id. This process is called "ensilage." Id. ¶ 13. "Silage bags" are a common type of anaerobic container used in the ensilage process. See id. ¶¶ 12, 14. Silage bags were developed as an alternative to storing silage in bunkers or fixed silos. Sutton Aff. ¶ 3. However, Silage bags are extremely sensitive. "Anything that weakens the plastic can cause the bag to split." Def.'s Mem. Supp. Summ. J. 12. Silage bags fail for numerous reasons, most often the overfilling of the bag, but failures are also caused by excessive moisture content of the silage, silage that is too dry, the type of crop used to make the silage, damage to the bags caused by weather or animals, or damage to the bag caused by a damaged bagging machine. Schuette Dep. (2007) 128–135; Pesik Dep. 193; see Farrar & Farrar Dairy, Inc. v. Miller-St. Nazianz, Inc., 254 F.R.D. 68, 70 (E.D.N.C. 2008) (listing examples of why silage bags fail).

Although Miller's main goal in purchasing Ag-Bag was to acquire its farm equipment business, Miller decided to continue distributing silage bags under the "Ag-Bag" name. See Malesevich Aff. ¶ 6. When Miller purchased most of Ag-Bag's assets, Ag-Bag had a supply agreement with a company called Up North Plastics, Inc. ("Up North"). Second Am. Compl. ¶ 21; Malesevich Aff. ¶ 6. Up North manufactured the plastic that Ag-Bag used for its silage bags. Second Am. Compl. ¶¶ 21–22; see Malesevich Aff. ¶ 6. Miller did not assume Ag-Bag's supply agreement with Up North when it purchased Ag-Bag's assets, and Miller therefore began looking for another plastic supplier to manufacture the material for the silage bags. Second Am. Compl. ¶ 23; Malesevich Aff. ¶¶ 6–7. In October 2004, Miller entered a business relationship with a Belgian company called Hyplast NV ("Hyplast"), whereby Hyplast agreed to manufacture plastic for the silage bags. See Malesevich Aff. ¶¶ 7, 9, 14, 17.

5

Miller did not receive a formula for the plastic that Ag-Bag used in making its silage bags when Miller purchased Ag-Bag's assets. Id. ¶ 16. Instead, Miller gave Hyplast an Ag-Bag silage bag that Up North had manufactured, and Hyplast reverse-engineered a formula. Id. ¶¶ 15–16. According to plaintiffs, Hyplast's reverse-engineered plastic formula did not properly address many of the necessary qualities that a plastic formula for silage bags requires. See Second Am. Compl. ¶ 24.[3] However, according to plaintiffs, Miller used the Hyplast-formulated plastic to put Ag-Bags to market, even though Miller knew that the Hyplast-formulated plastic was insufficient. See id. ¶ 25.

Plaintiffs began using Ag-Bags to store their silage in August of 2003, because their previous storage method resulted in toxic feed and dead cattle. Farrar Dep. 23, 115–16. Plaintiffs initially rented a bagging machine from another farmer, who supplied plaintiffs with the necessary Ag-Bags. Id. at 23. On April 7, 2004, plaintiffs purchased their own Ag-Bag bagging machine. Id. at 28. On April 18, 2005, plaintiffs purchased 12 Ag-Bag silage bags from an authorized dealer. Pls.' Resp. KPPM's Interrog. No. 1. On August 15, 2005, plaintiffs purchased an additional 14 bags. Id. Up North manufactured some of the bags and Hyplast manufactured some of the bags. Schuette Dep. 54. "[T]he [Hyplast] bags were only identifiable as being made by Hyplast to a trained eye, from the existence of a serial code on the bag." Pls.' Mem. Opp'n Summ. J. 20.

Miller sold its Ag-Bags with the following express warranty:

> Ag-Bag, a Miller St. Nazianz Inc. Co. guarantees our "Bonded"[] silage bags to be free of defects in workmanship and materials. If a properly packed bag should fail from a defect during normal useful life, Ag-Bag will replace the bag without

---

[3] Miller and Hyplast had their own legal disagreement, which settled in late December 2005. See Malesevich Aff. ¶ 21. Plaintiffs also sued Hyplast in this case, and Miller attempted to bring a cross-claim against Hyplast. Ultimately, the court determined that it lacked personal jurisdiction over Hyplast [D.E. 103].

6

charge. If the feed in the damaged bag requires rebagging[,] Ag-Bag will replace the bag with two bags.

Pesik Dep., Ex. 37 at 2; Farrar Dep. (2007) 61. Miller also included in each box a document titled "Flat-Folded Bag Installation Instructions" which contained the following:

> All recommendations or suggestions of use are made without guarantee, since conditions of use are beyond our control. Ag-Bag, a Miller St. Nazianz, Inc. Co. maintains no obligations or liabilities for consequential damages arising out of, or in connection with use of this product, including but not limited to inconvenience, loss of profit, commercial use, food loss of any type, or costs of removal, installation or reinstallation.

Pesik Dep., Ex. 39 at 2; Farrar Dep. (2007) 61.

According to plaintiffs, eight of the silage bags that Miller sold to plaintiffs were defective, and failed even though they were used properly. Second Am. Compl. ¶ 30; Farrar Dep. (2007) 139–40. Plaintiffs notified Miller of the failures, and a Miller representative inspected the failed bags. Miller then processed the warranty claims and provided plaintiffs with replacement bags. See Farrar Dep. (2007) 61–62; Hull Dep. 81, 104–05; Schuette Dep. (2007) 43–44. Plaintiffs allege that they suffered various damages from these bag failures, including the costs of re-bagging the silage that did not spoil, disposing of the silage that did spoil, acquiring new silage bags and silage storage techniques, acquiring new silage to feed the livestock, decreased farm profitability, decreased dairy production, and other costs. Second Am. Compl. ¶ 31. Plaintiffs' second amended complaint includes claims for negligence (id. ¶¶ 47–53); breach of express warranty (id. ¶¶ 54–61); breach of implied warranty of merchantability (id. ¶¶ 62–66); unfair trade practices in violation of Wisconsin law (id. ¶¶ 67–70); and restitution/disgorgement of unjust enrichment (id. ¶¶ 71–73). However, in response to Miller's motion for summary judgment, plaintiffs abandoned their claims for unfair trade practices in violation of Wisconsin law and for restitution/disgorgement of unjust enrichment.

7

See Pls.' Mem. Opp'n Summ. J. 2 n.1. Thus, the court addresses the negligence and breach of warranty claims, which the parties agree arise under North Carolina law.

III.

Plaintiffs claim that Miller was negligent because Miller distributed defective silage bags manufactured for Miller by Hyplast and failed to adopt "reasonable quality control practices." Second Am. Compl. ¶ 49. North Carolina law requires that a plaintiff bringing a products liability action based on negligence prove "(1) the product was defective at the time it left the control of the defendant, (2) the defect was the result of defendant's negligence, and (3) the defect proximately caused plaintiff damage." Red Hill Hosiery Mill, Inc. v. MagneTek, Inc., 138 N.C. App. 70, 75, 530 S.E.2d 321, 326 (2000). A plaintiff may rely on an inference to prove the first element (a product defect) when circumstantial evidence shows the product's malfunction and that the product had been put to its ordinary use. Id. at 76–77, 530 S.E.2d at 327 (collecting cases). Also, when a plaintiff has direct evidence of a product defect (such as through expert testimony of a product defect), a plaintiff may rely on an inference that the second element (negligence) exists. Id. at 75, 530 S.E.2d at 326. However, "a plaintiff may not prove negligence by stacking inference upon inference." Carlton v. Goodyear Tire & Rubber Co., 413 F. Supp. 2d 583, 588 (M.D.N.C. 2005). Thus, a plaintiff who relies on indirect evidence to prove the first element (i.e., product defect) may not also rely on an inference to prove the second element (i.e., negligence). See id.

Because "even the most careful manufacturer may produce a defective product," a plaintiff without direct evidence of a product defect must prove "that the defect flowed from a failure to exercise reasonable care." Red Hill Hosiery Mill, Inc., 138 N.C. App. at 75 n.5, 530 S.E.2d at 326 n.5; Carlton, 413 F. Supp. 2d at 588. Therefore, without direct evidence of a product defect, the second element requires that the plaintiff "come forward with evidence that suggests what a

8

reasonable person would do in similar circumstances." McLaurin v. E. Jordan Iron Works, Inc., 666 F. Supp. 2d 590, 600 (E.D.N.C. 2009); Snoznik v. Jeld-Wen, Inc., No. 1:09cv42, 2010 U.S. Dist. LEXIS 46814, at *61–65 (W.D.N.C. May 12, 2010) (unpublished); Nicholson v. Am. Safety Utility Corp., 124 N.C. App. 59, 66–67, 476 S.E.2d 672, 677–78 (1996); Cockerham v. Ward, 44 N.C. App. 615, 620–24, 262 S.E.2d 651, 655–57 (1980).

Here, plaintiffs claim that they have direct evidence of a product defect. However, the alleged direct evidence all relates to Hyplast's manufacturing process generally. See Pls.' Mem. Opp'n Summ. J. 7–9; Pls' Mem. Opp'n Exclude Priddy Report 5–8. Plaintiffs cite no direct evidence of defect specific to their failed bags. For example, plaintiffs offer no expert testimony that the bags that broke were defective. Cf. Def.'s Mem. Supp. Mot. Exclude 2–14; Pls.' Mem. Opp'n Exclude Priddy Report 5–8. Furthermore, "the bags were only identifiable as being made by Hyplast to a trained eye, from the existence of a serial code on the bag." Pls.' Mem. Opp'n Summ. J. 20. Thus, although plaintiffs and their employees thought they could identify which bags Hyplast manufactured and which bags Up North manufactured, the record indicates their attempt at distinguishing them to be mere speculation. See Hull Dep. 63, 89–90, 157–58; Farrar Dep. (2007) 37, 241–44, 247–49; Farrar Dep. (2010) 19, 24. In sum, plaintiffs are unable to prove who manufactured the bags that failed and lack direct evidence of a defect in the failed bags. Without direct evidence that Hyplast manufactured at least one of the eight bags that failed, a jury would be required to infer that the bags that broke were defective through evidence of ordinary use and failure. See, e.g., Red Hill Hosiery Mill, Inc., 138 N.C. App. at 76–77, 530 S.E.2d at 326–27. Thus, plaintiffs rely on indirect evidence to prove the first element.

In light of plaintiffs' reliance on indirect evidence to prove the first element (i.e., product defect), plaintiffs cannot also rely on an inference to prove the second element (i.e., negligence).

See, e.g., Carlton, 413 F. Supp. 2d at 588. Such stacking of an inference of product defect on an inference of negligence would result in strict liability for product failure. Therefore, plaintiffs are required to provide direct evidence of negligence in order to meet their burden of proof on the second element of their negligence claim. Id.

Here, plaintiffs allege that Miller failed to adopt a reasonable quality control practice to check the quality of bags manufactured by Hyplast. Second Am. Compl. ¶ 49. In support, they cite evidence suggesting that Miller knew other silage bag manufacturers had previously manufactured defective silage bags and that Miller considered having an independent lab analyze Hyplast's bags to confirm their quality. Pls.' Mem. Opp'n Summ. J. 22. However, the record lacks any information as to quality control mechanisms that distributors generally employ for goods manufactured by an independent manufacturing company. Cf. McLaurin, 666 F. Supp. 2d at 600; Carlton, 413 F. Supp. 2d at 588. Moreover, Miller's knowledge that other companies had problems with their silage bag manufacturers or Miller's contemplation of obtaining an independent lab analysis of the bags are insufficient to show whether a reasonable person, in similar circumstances to Miller, would have conducted such an independent lab analysis or adopted some other quality control measure. Therefore, plaintiffs have failed to raise a genuine issue of material fact that the product defect was the result of Miller's negligence. See, e.g., Carlton, 413 F. Supp. 2d at 588. Accordingly, plaintiffs' negligence claim fails, and the court grants summary judgment to Miller.[4]

IV.

Plaintiffs also allege a breach of Miller's express warranty and a breach of an implied warranty of merchantability. Second Am. Compl. ¶¶ 54–66. Miller does not concede that its

---

[4] In light of this conclusion, the court need not and does not address Miller's alternative arguments concerning the negligence claim. See Def.'s Mem. Supp. Summ. J. 19–23, 25.

10

express warranty was breached, but argues that even assuming a breach, Miller fulfilled its obligations under the limited warranty. Miller also claims that it properly limited the remedy available to plaintiffs in the event of a breach of warranty, including the exclusion of any and all consequential damages. See Def.'s Mem. Supp. Summ. J. 26–29. Plaintiffs reply that any limitation of remedy fails of its essential purpose and that any exclusion of consequential damages is unconscionable. See Pls.' Mem. Opp'n Summ. J. 23–27.

Under North Carolina law, a seller creates an express warranty by actively affirming or promising a buyer that a product will conform to certain descriptions of that good. See N.C. Gen. Stat. § 25-2-313(1). In contrast, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.C. Gen. Stat. § 25-2-314(1). Goods are merchantable if they are fit for their ordinary purpose for which such goods are used. Id., § 25-2-314(2)(c). However, a seller may expressly disclaim or modify any warranty obligation arising by operation of law. Id., § 25-2-316. Such a disclaimer or modification of an implied warranty of merchantability must be conspicuous and use specific language that "calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." Id., § 25-2-316(2), (3)(a). When both an express and implied warranty exist, the law requires they be construed as consistent and cumulative to the extent reasonable. Id., § 25-2-317. If in conflict, an express warranty will displace inconsistent implied warranties. Id.

In addition to limiting the duties that arise under a warranty, a party also may choose to limit the remedy available in the event of a breach of those duties. Id., § 25-2-719. Although the two concepts are closely related, a court must analyze the limitations separately. Williams v. Hyatt Chrysler-Plymouth, Inc., 48 N.C. App. 308, 315–16, 269 S.E.2d 184, 188–189 (1980). When a buyer accepts goods and gives notice of a breach of warranty, the typical measure of damages is the

11

difference between the value of the goods accepted and the value they would have had as warranted. See N.C. Gen. Stat. § 25-2-714. Consequential damages, including injury to person or property proximately resulting from a breach of warranty, also may be recovered. Id., §§ 25-2-714(3), 25-2-715(2)(b). However, parties may provide for additional, substitute, or exclusive damage remedies, including an exclusive remedy of the replacement of nonconforming goods, so long as a limitation to an exclusive remedy is expressly stated. Id., § 25-2-719. Otherwise, resort to a remedy provided by the agreement is optional. Id. Furthermore, an agreement may limit or exclude consequential damages, unless such limitation or exclusion is found unconscionable. Id.

Here, Miller owed a duty under its express warranty. See N.C. Gen. Stat. § 25-2-313. Moreover, Miller failed to conspicuously disclaim or modify its duty under an implied warranty of merchantability. Therefore, Miller owed a duty to plaintiffs under both the express warranty and the implied warranty of merchantability. The two warranties are consistent, and therefore are treated as cumulative.

Miller attempted to limit the remedy available to a buyer of its silage bags in the event of a breach of warranty. Specifically, Miller's express warranty provided that should an Ag-Bag fail from defect, it would be replaced without charge. Furthermore, should the damaged bag require the farmer to rebag the feed, Miller would provide two bags. However, Miller did not state that this was the exclusive remedy available to a buyer. Therefore, upon failure of an Ag-Bag, a buyer could avail himself of either Miller's proposed remedy or the traditional remedy available under N.C. Gen. Stat. § 25-2-714.

Here, plaintiffs chose to remedy the breach of warranty by accepting replacement bags. See Farrar Dep. (2007) 61–62; Hull Dep. 81, 104–05; Schuette Dep. (2007) 43–44. This choice precludes plaintiffs from now seeking the statutory remedy under N.C. Gen. Stat. § 25-2-714. See,

e.g., Stutts v. Green Ford, Inc., 47 N.C. App. 503, 515, 267 S.E.2d 919, 926 (1980). Moreover, Miller's failure to make its proposed remedy exclusive has no effect on its exclusion of consequential damages. Williams, 48 N.C. App. at 316, 269 S.E.2d at 189; Stutts, 47 N.C. App. at 516, 267 S.E.2d at 926. Thus, to prevail on its claim for consequential damages, plaintiffs must demonstrate that the exclusion of consequential damages is "unconscionable." N.C. Gen. Stat. § 25-2-719(3).

Unconscionability is a question of law for the court. Id., § 25-2-302; Billings v. Joseph Harris Co., 27 N.C. App. 689, 695, 220 S.E.2d 361, 366 (1975). "Unconscionability relates to contract terms that are oppressive." Billings, 27 N.C. App. at 695, 220 S.E.2d at 366. Although personal injury plaintiffs enjoy a presumption of unconscionability, "[n]o similar presumption is provided in cases of commercial loss, thus putting the burden on plaintiff[s] to show otherwise." Id. "Courts rarely find limitation clauses in transactions between experienced businessmen unconscionable." Stan D. Bowles Distrib. Co. v. Pabst Brewing Co., 69 N.C. App. 341, 351, 317 S.E.2d 684, 690 (1984). A contract that provides "minimum adequate remedies" is not unconscionable. Id. at 350, 317 S.E.2d at 690 (quotation omitted).

Here, in addition to the warranty contained in the bags, plaintiffs admit to having read an identical exclusion of consequential damages contained in the manual for their Ag-Bagger machine before purchasing the allegedly defective bags. See Farrar Dep. (2007) 53–58. After the first bag failures, plaintiffs accepted Miller's proposed remedy, and continued to purchase bags from Miller. Id. at 62; Schuette Decl. ¶ 13; Schuette Dep. (2007) 37, 43, 46, 54. Plaintiffs have failed to demonstrate that the exclusion was oppressive or that the warranty is void as inadequate. Given the inherent element of risk present in all agricultural enterprises, and the numerous potential reasons for bag failure, Miller's exclusion of consequential damages was not unconscionable. See, e.g.,

13

Billings, 27 N.C. App. at 694-95, 220 S.E.2d at 366. Therefore, plaintiffs are precluded from recovering consequential damages. Furthermore, because plaintiffs already have elected recovery by replacement of the bags, they are not entitled to any additional recovery under N.C. Gen. Stat. § 25-2-714. See, e.g., Stutts, 47 N.C. App. at 515, 267 S.E.2d at 926. Thus, the court grants summary judgment to Miller on plaintiffs' claims for breach of express warranty and breach of implied warranty.[5]

V.

For the reasons discussed above, plaintiffs' motion for leave to file a third amended complaint [D.E. 176] is DENIED, defendant's motion for summary judgment is GRANTED [D.E. 149], and defendant's motion to exclude the testimony of plaintiffs' expert at trial [D.E. 154] is DENIED as moot.

SO ORDERED. This 31 day of March 2011.

JAMES C. DEVER III
United States District Judge

---

[5] In light of the court's analysis of the breach of warranty claims, the court need not and does not address Miller's alternative arguments concerning the breach of warranty claims. See Def.'s Mem. Supp. Summ. J. 28-29.

14